# In the United States Court of Federal Claims

No. 07-280 C

(Filed September 26, 2007)[1]

| | |
|---|---|
| * * * * * * * * * * * * * * * * | |
| IRONCLAD/EEI, A Joint Venture, | |
| | |
| *Plaintiff*, | |
| | |
| v. | |
| | |
| THE UNITED STATES, | Post-Award Bid Protest; Standing to Protest Multiple Award Solicitation; Direct Economic Interest; Waiver of Claims Based Upon Failure to Provide Briefing; Amendment of Solicitation after Selection of Competitive Range; Duty to Treat Offerors Fairly and Equally in Government Procurements. |
| *Defendant*, | |
| | |
| CAMPBELL ROOFING & CONSTRUCTION, INC., | |
| | |
| MGC/CAMPBELL ROOFING & CONSTRUCTION, INC., | |
| | |
| CROWN ROOFING SERVICES, INC., and | |
| | |
| R.L. CAMPBELL ROOFING COMPANY, INC. | |
| | |
| *Intervenor-defendants*. | |
| * * * * * * * * * * * * * * * * | |

*Kevin M. Cox*, Auburn, NY, for plaintiff.

---

[1]/ This opinion was originally filed under seal on September 4, 2007, in accordance with the protective order requested by the parties. The parties proposed no redactions and agreed that the information contained herein could become part of the public record of this action.

*Carrie A. Dunsmore*, with whom were *Peter D. Keisler*, Assistant Attorney General, *Jeanne E. Davidson*, Director, *Bryant G. Snee*, Assistant Director, Washington, D.C., for defendant. *Donna W. Black*, United States Army Corps of Engineers, Mobile, AL, of counsel.

*J. Hatcher Graham*, Warner Robins, GA, for intervenor-defendants Campbell Roofing & Construction, Inc. and MGC/Campbell Roofing & Construction, Inc. *Herman C. Hoffman*, New Orleans, LA, for intervenor-defendants Crown Roofing Services, Inc. and R.L. Campbell Roofing Company, Inc.

_____

**OPINION**
_____

**Bush**, *Judge*.

This post-award bid protest action is before the court following cross-motions for judgment on the administrative record, filed under Rule 52.1 of the Rules of the United States Court of Federal Claims (RCFC). Plaintiff Ironclad/EEI, A Joint Venture (plaintiff, Ironclad) is a joint venture comprised of Ironclad Services, Inc. (Ironclad Services) and Enfield Enterprises, Inc. (EEI). In this suit, Ironclad challenges twelve contracts for temporary roof repair awarded by the United States Army Corps of Engineers in 2006. Plaintiff claims that the Corps made several errors during the procurement process leading up to those awards which deprived Ironclad of the right to full and open competition for the work offered. Plaintiff asks the court to order that the awards be cancelled and the work resolicited.

The administrative record (AR) in this matter was filed on May 22, 2007. Plaintiff moved for judgment on the administrative record on June 21, 2007, and the United States and four intervenor-defendants (collectively, defendants) filed cross-motions to dismiss and for judgment on the administrative record on July 23 and 24, 2007. Ironclad responded to defendants' motions on August 2, 2007, and defendants replied on August 13, 2007. Discovery was not requested by the parties. Oral argument was heard on August 17, 2007. For the reasons that follow,

the court finds that plaintiff has no standing to challenge the awards at issue in this protest.

## BACKGROUND[2]

On November 30, 2005, the United States Army Engineer District, Mobile Contracting Division, Mobile, Alabama (the Corps) issued Request for Proposals Solicitation W91278-06-R-0007 (the solicitation). AR at 30. Through the solicitation, the Corps requested proposals for multiple Indefinite Delivery/Indefinite Quantity (IDIQ) contracts for Contingency Contract Initiative (CCI) Temporary Roof Repairs in support of the Corps' and the Federal Emergency Management Agency's (FEMA) disaster response in Maryland, Virginia, North Carolina, South Carolina, Georgia, Florida, Alabama, Mississippi, Louisiana, and Texas.[3] *Id.* The solicitation provided that three of the contracts offered by the Corps would be subject to full and open competition between all offerors, regardless of size. *Id.* at 145. In addition, one contract would be awarded to a business located in a Historically Underutilized Business Zone (HUBZone); one would be granted to a Service Disabled Veteran Owned Business (SDVOB); and twenty would be awarded via the United States Small Business Administration (SBA) to socially and/or economically disadvantaged small businesses, pursuant to section 8(a) of the Small Business Act.[4] The procurement was assigned North American Industrial Classification System (NAICS) code 238160, "Roofing Contractors," which provided that businesses which hoped to secure the available

---

[2] The facts which led to this bid protest are agreed upon by the parties, unless otherwise indicated. None of the facts expressed in this section constitute findings of fact by the court. This recitation of the history of the case is provided for informational purposes only.

[3] The solicitation initially covered only five states, but its geographical reach was expanded by the Corps pursuant to Amendment 001 to the solicitation. *See* AR at 30.

[4] "The SBA's section 8(a) program was established to promote the viability of socially and economically disadvantaged small business concerns by empowering the [SBA] to enter into contracts with other federal agencies and to arrange for the performance of such contracts by negotiating or otherwise letting subcontracts to small business concerns." *P.R. Contractors, Inc. v. United States*, 76 Fed. Cl. 621, 623 n.2 (2007) (internal quotation marks omitted) (quoting *Baker v. Dep't of Health and Human Servs.*, 912 F.2d 1448, 1450 (Fed. Cir. 1990) and citing 48 C.F.R. § 19.800(a)).

small business set-aside awards could have annual profits of no more than $12 million.[5]  *Id.* at 25-26.

The solicitation provided that the maximum dollar amount for each contract was not to exceed $100 million for the unrestricted, HUBZone and SDVOB awards, and $25 million for the section 8(a) awards.  *Id.* at 145.  It also stated that "[f]rom those offers that have passed the Proposal Compliance Review, the Source Selection Authority may limit the number of offers to be passed on to the Source Selection Evaluation Board to the lowest priced Offerors (usually, the lowest 5-7) under the socioeconomic categories described below."  *Id.* at 112.  The document further advised offerors that "[r]egardless of how many contracts are awarded, each Offeror will be eligible for award on only one contract."  *Id.* at 190.

Plaintiff alleges that, at some time in 2005, a representative of EEI contacted the SBA, the federal agency charged with enforcing the provisions of the Small Business Act, and inquired about the size standards applicable to the procurement. Specifically, EEI asked "how the NAICS code standard would be applied to a joint venture that it intended on forming with Ironclad [Services]."  Pl.'s Mot. at 4. According to plaintiff, "[t]he SBA advised EEI that Ironclad [Services] was a SDVOB and since it would own 51% of the Joint Venture, and since the Joint Venture had no previous contracts, it would be in compliance with the NAICS Code requirements."  *Id.*  This alleged explanation regarding the size qualifications for joint ventures was contrary to both the SBA regulations and the terms of the solicitation, which included those regulations in its text.[6]  *See* AR at 260 (incorporating requirement to comply with 13 C.F.R. § 121.15(b) and reiterating that regulation's terms).

_____

[5]/  NAICS codes are used by government agencies and the SBA to establish size standards governing eligibility for small business preferences under government programs and procurements.  *See Advanced Sys. Tech., Inc. v. United States*, 69 Fed. Cl. 474, 475 n.1 (2006) (citing 13 C.F.R. §§ 121.101, 121.402 (2006)).

[6]/  13 C.F.R. § 125.15(b) (2007) provides that a service disabled veteran owned small business concern, like Ironclad Services, "may enter into a joint venture agreement with one or more other [small business concerns] for the purpose of performing an SDVO contract."  There is no question that EEI is a large business.  Thus, under the existing small business regulations, the joint venture between Ironclad Services and EEI is not eligible for an SDVOB award.

On February 2, 2006, plaintiff submitted a proposal to the Corps which requested consideration for the SDVOB and unrestricted portions of the procurement.  AR at 659 *et seq*.  On April 7, 2006, Ironclad was awarded the SDVOB contract.  On April 13, 2006, ESA South, Inc. (ESA South), an unsuccessful offeror on the SDVOB contract, filed a size protest with the Corps which alleged that Ironclad exceeded the applicable size standard for the SDVOB portion of the solicitation.  *Id.* at 426.  Ironclad learned of the protest on May 1, 2006.  Two days later, on May 3, 2006, plaintiff sent a letter to the Corps which acknowledged that the joint venture exceeded the size limit for the SDVOB contract, and requested that Ironclad continue to be considered for the unrestricted awards.  *See id.* at 419.

Eleven other contracts were ultimately awarded by the Corps.  Intervenor-defendant Crown Roofing Services, Inc. (Crown) was awarded two section 8(a) contracts, in spite of the solicitation's provision that only one contract could be awarded to each offeror.  *Id.* at 1568, 1569.  Intervenor-defendants MGC/Campbell Roofing & Construction, Inc. (MGC/Campbell) and RL Campbell Roofing Company, Inc. (RL Campbell) were each awarded one section 8(a) contract.  *Id.* at 1543, 1545.  Intervenor-defendant Campbell Roofing & Construction, Inc. (Campbell) secured an unrestricted award.  *Id.* at 1715.

On May 4, 2006, defendant issued Solicitation Amendment 0012 (Amendment 12), which eliminated the solicitation's restriction providing that only one contract could be awarded to each offeror.  There is no question that this amendment was issued after the Corps had already awarded two contracts to Crown Roofing.  Defendant, however, asserts that "the Corps had intended to eliminate this provision when the geographic scope of the contract was expanded," as a part of Amendment 001 to the solicitation (Amendment 1), and that, after the Corps learned that the change had not been accomplished via Amendment 1, the agency issued Amendment 12 "to clarify the [s]olicitation and to make clear that one offeror could be awarded more than one contract under the [s]olicitation."  Def.'s Mot. at 16 (citing AR at 122-25, 441); Sawyer Aff. ¶ 12 (explaining that the Mobile District discovered on or about May 3, 2006, that the limitation of one contract per offeror had not been deleted from the solicitation as had been intended by the agency when it issued Amendment 1, and that it issued Amendment 12 on May 4, 2006 "to simply correct a clerical error in the issuance of Amendment 1").

On or about May 16, 2006, plaintiff sent a letter to the SBA which stated that, upon review of ESA South's protest and the applicable regulations, it appeared that Ironclad did not qualify as a small business, and plaintiff would not oppose ESA South's size protest. *Id.* at 419, 423. On the next day, the SBA issued Size Determination No. 3-2006-58, in which it concluded that plaintiff was not a small business under the applicable size standard, making it ineligible for the SDVOB award. *Id.* at 423.

On or about May 25, 2006, Ironclad learned that it had been eliminated from the competitive range for the unrestricted portion of the procurement. Plaintiff claims that, on this date, it requested a post-award debriefing regarding its proposal for the unrestricted work. The government responded to that request on May 30, 2006, but explained only that Ironclad had been eliminated from the competitive range because it was not among the five to seven lowest priced offerors for the unrestricted awards. Plaintiff alleges that, on the same day, it sent a letter to the Corps which alleged that RL Campbell was not a small business and thus was not eligible for the section 8(a) award it had received. In that letter, Ironclad asked the government to file an appropriate size determination protest with the SBA regarding RL Campbell's size status, or to "cancel the procurement and reissue the solicitation under a higher dollar size standard." Pl.'s Mot. at 9. Defendant did not, however, forward this protest to the SBA for consideration. The Corps asserts that it never received Ironclad's letter. *See* Hickman Decl.

On June 8, 2006, the Corps issued Modification P00001 to Ironclad's SDVOB contract. That document, in furtherance of the SBA's Size Determination No. 3-2006-58, amended the SDVOB contract to reflect a no-cost settlement agreement between the parties on the ground that the SBA, as the intermediary in SDVOB contracting, had declined to enter into an SDVOB contract with plaintiff. This contract termination was issued pursuant to Federal Acquisition Regulations (FAR) 49.101(b) and 46.603-6. AR at 1776. On June 13, 2006, Ironclad attempted to appeal the SBA's decision that it was "other than small" to the SBA's Office of Hearings and Appeals (OHA), on the ground that ESA South lacked standing to challenge the award to plaintiff. *See id.* at 419. Eight days later, on June 21, 2006, Ironclad submitted its own size determination protest to the SBA regarding several of the other contract awardees. Plaintiff states that the SBA never responded to that protest.

On July 13, 2006, OHA dismissed Ironclad's appeal of ESA South's protest as untimely and, alternatively, as meritless. In its dismissal order, OHA noted that the appeal was unfounded, given plaintiff's admission that it was ineligible for the SDVOB award. Ironclad filed this suit in the Court of Federal Claims almost ten months later, on May 4, 2007.

## DISCUSSION

## I.    Jurisdiction

As stated, this is a post-award bid protest action. There is no question that the Tucker Act provides the United States Court of Federal Claims with bid protest jurisdiction. 28 U.S.C. § 1491(b)(1)-(4) (2000); *Am. Fed'n of Gov't Employees, AFL-CIO v. United States*, 258 F.3d 1294, 1300 (Fed. Cir. 2001); *Hunt Bldg. Co. v. United States*, 61 Fed. Cl. 243, 268-69 (2004). The statute explicitly provides that this court "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); *see Hunt Building*, 61 Fed. Cl. at 269 (quoting 28 U.S.C. § 1491(b)(1)). The statute also states that the Court of Federal Claims "shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded." 28 U.S.C. § 1491(b)(1). Accordingly, this court has jurisdiction to entertain post-award bid protests such as this one.

## II.   Standards of Review

### A.    Lack of Subject Matter Jurisdiction

Defendants argue that this suit must be dismissed because plaintiff lacks standing to challenge the awards at issue in this protest, and therefore, the court has no subject matter jurisdiction over Ironclad's claims. It is not altogether clear, under the law of this circuit, whether a motion to dismiss for lack of standing should be analyzed under RCFC 12(b)(1), which concerns the absence of subject matter jurisdiction, or RCFC 12(b)(6), which addresses failure to state a claim upon which relief can be granted. *See Boston Edison Co. v. United States*, 64 Fed. Cl. 167, 174 (2005) (citing and comparing *Landmark Land Co. v. Federal Deposit*

*Ins. Corp.*, 256 F.3d 1365, 1380 (Fed. Cir. 2001); *Animal Legal Def. Fund v. Quigg*, 932 F.2d 920, 925 (Fed. Cir. 1991)); *see also Dawnwood Properties/78 v. United States*, 53 Fed. Cl. 168, 171 (2002) (explaining that "[t]he lack of clarity may stem from the fact that standing issues raise both constitutional and prudential considerations").  It is well-settled, however, that subject matter jurisdiction may be challenged by the parties, or by the court on its own initiative, at any time.  If jurisdiction is found to be lacking, the court must dismiss the action.  RCFC 12(h)(3).

The court's determination of jurisdiction begins with an examination of the complaint, "which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." *Holley v. United States*, 124 F.3d 1462, 1465 (Fed. Cir. 1997).  The court must presume all undisputed factual allegations to be true, and construe all reasonable inferences in favor of the plaintiff.  *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988); *Boston Edison*, 64 Fed. Cl. at 174 (stating that "[r]egardless of which standard is used, for purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party" (internal quotations omitted) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975))). However, "'[f]act finding is proper when considering a motion to dismiss where the jurisdictional facts in the complaint . . . are challenged.'"  *Boston Edison*, 64 Fed. Cl. at 174 (quoting *Moyer v. United States*, 190 F.3d 1314, 1318 (Fed. Cir. 1999)).  The non-movant bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence.  *Cubic Def. Sys., Inc. v. United States*, 45 Fed. Cl. 239, 245 (1999) (citing *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993); *Reynolds*, 846 F.2d at 748; *Maniere v. United States*, 31 Fed. Cl. 410, 413 (1994)); *see also Boston Edison*, 64 Fed. Cl. at 174 (stating that a plaintiff invoking federal jurisdiction bears the burden to establish the elements of standing).

## B.    Judgment on the Administrative Record

The parties have also filed cross-motions for judgment on the administrative record, under RCFC 52.1.  The standard for evaluating such motions is similar to that used to decide a motion for summary judgment under RCFC 56.  *Info. Sciences Corp. v. United States*, 73 Fed. Cl. 70, 97-98 (2006) (citing *Bannum, Inc.*

*v. United States*, 404 F.3d 1346, 1355 (Fed. Cir. 2005)).  It is beyond cavil that, on a traditional motion for summary judgment, the court must inquire "whether the moving party has proven its case as a matter of fact and law or whether a genuine issue of material fact precludes judgment."  *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).  A Rule 52.1 motion, by contrast, calls for a more narrow review of whether, given the disputed and undisputed facts, the plaintiff has met its burden to show that a challenged decision was not in accordance with law.  *Id.*  "[T]wo principles commonly associated with summary judgment motions–that the existence of a genuine issue of material fact precludes a grant of summary judgment and that inferences be weighed in favor of the non-moving party . . . are inapplicable to a motion for judgment on the administrative record . . . ."  *Int'l Outsourcing Servs., L.L.C. v. United States*, 69 Fed. Cl. 40, 45 (2005) (citing *Bannum*, 404 F.3d at 1356).  In other words, under Rule 52.1,

> the existence of a fact question neither precludes the granting of a motion for judgment nor requires this court to conduct a full blown evidentiary proceeding.  Rather, such fact questions must be resolved by reference to the administrative record, as properly supplemented – in the words of the Federal Circuit, "as if [this court] were conducting a trial on [that] record."

*Id.* at 45-46 (quoting *Bannum*, 404 F.3d at 1357).

## C.    **Bid Protest Review**

It is well settled that "this court's review of an agency's decision regarding a contractual solicitation or award takes place in accord with standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706."  *Asia Pac. Airlines v. United States*, 68 Fed. Cl. 8, 19 (2005); *ViroMed Labs., Inc. v. United States*, 62 Fed. Cl. 206, 211 (2004); *see also* 28 U.S.C. § 1491(b)(4) (2000) ("In any action under this [bid protest] subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *Bannum*, 404 F.3d at 1351 (stating that "the trial court [first] determines whether . . . the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A)").  Accordingly, the court must determine whether the contracting agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A) (2000); *Bannum*, 404 F.3d at 1351; *Advanced Data Concepts,*

*Inc. v. United States*, 216 F.3d 1054, 1057 (Fed. Cir. 2000).  The plaintiff bears the burden of proving the arbitrary and capricious nature of the award, by a preponderance of the evidence.  *Hunt Building*, 61 Fed. Cl. at 269; *see also Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 995 (Fed. Cir. 1996).  "Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts."  *ViroMed Laboratories*, 62 Fed. Cl. at 212 (citing *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  The court should overturn the challenged decision only if "'(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'"  *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)); *see also Hunt Building*, 61 Fed. Cl. at 269.  Essentially,

> [w]hen a challenge is brought on the first ground, the test is whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis. When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations.

*Banknote*, 365 F.3d at 1351 (internal quotations and citations omitted) (quoting *Impresa*, 238 F.3d at 1332-33).

If it is determined that a contract was awarded in violation of APA standards, the court must then evaluate whether the plaintiff, as an unsuccessful bidder, was prejudiced significantly by the government's conduct.  *Bannum*, 404 F.3d at 1353.  Indeed, in order to prevail in a bid protest, a claimant must provide evidence of "'not only a significant error in the procurement process, but also that the error prejudiced it.'"  *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (quoting *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996)).  This requires evidence of a "substantial chance" that the protestor would have received the contract award, but for the alleged error or errors.  *Id.* at 1331; *see also Emery Worldwide Airlines, Inc. v. United States*, 264

F.3d 1071, 1086 (Fed. Cir. 2001) ("To establish prejudice in an action involving an alleged statutory or regulatory violation, a protester must show that absent the error, there was a substantial chance it would have received the contract award.") (internal quotations omitted) (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999))).

## III.   Merits

### A.   Waiver

As a threshold matter, the United States argues that Ironclad has waived several of the claims set forth in its complaint, because plaintiff did not address those claims in its briefing.  As the United States correctly points out, Ironclad's motion for judgment on the administrative record provides no argument in support of plaintiff's claims (1) that the Corps assigned the wrong NAICS code to this procurement (Count II); (2) that the SBA committed errors in interpreting that NAICS code (Count III); (3) that the Corps' past performance evaluations were flawed (Count IV); and (4) that Ironclad's appeal to OHA was timely and entitled to consideration on the merits (Count VI).  Def.'s Mot. at 14.  Defendant also contends that Ironclad has waived its request for permanent injunctive relief, because plaintiff did not address the factors relevant to such relief in its motion, but instead discussed them in its response brief only.  *Id.* at 29 n.14.

Defendant is correct in its assertion that, under the law of this circuit, arguments not presented in a party's principal brief to the court are typically deemed to have been waived.  As the United States Court of Appeals for the Federal Circuit explained in *Novosteel SA v. United States and Bethlehem Steel Corporation*,

> [r]aising [an] issue for the first time in a reply brief does not suffice; reply briefs *reply* to arguments made in the response brief - they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration.  Further, the non-moving party ordinarily has no right to respond to the reply brief, at least not until oral argument.

284 F.3d 1261, 1274 (Fed. Cir. 2002) (emphasis in original).  In addition, it is imperative that "parties . . . give a trial court a fair opportunity to rule on an issue other than by raising that issue for the first time in a reply brief . . . ."  *Id.*  For these reasons, courts are constrained to find, "[a]s a matter of litigation fairness and procedure," that arguments not addressed in moving briefs have been waived.  *Id.*; *see also United States v. Ford Motor Co.*, 463 F.3d 1267, 1277 (Fed. Cir. 2006) (finding that the plaintiff had waived an argument by failing to raise it in its opening brief and stating that "[i]t is unfair to consider an argument to which the government has been given no opportunity to respond"); *Norman v. United States*, 429 F.3d 1081, 1091 n.5 (Fed. Cir. 2005).

Here, there is no question that Ironclad failed to address counts II, III, IV and VI of its complaint in both its motion for judgment on the administrative record and its response to the defendants' cross-motions.  In fact, in its response brief, Ironclad did not even address the government's contention that it had waived those aspects of its suit.  Plaintiff did provide some detail in regard to the claims in the complaint itself, but that fact is of little significance because "a party does not waive an argument based on what appears in its pleading; a party waives arguments based on what appears in its brief."  *Novosteel*, 284 F.3d at 1274.  The court finds that, because plaintiff has provided no substantive support for these four claims in its motion or response, and defendants have therefore been deprived of an opportunity to respond to them, plaintiff has waived these counts of the complaint.  *Id.*; *see also Ford Motor Company*, 463 F.3d at 1277; *Norman*, 429 F.3d at 1091 n.5.

Regarding plaintiff's request for permanent injunctive relief, however, the court concludes that a finding of waiver is not necessarily mandated in this instance.  The Federal Circuit has made it clear that waiver is "not governed by a rigid rule," and that exceptions to the waiver doctrine may be appropriate in instances "where circumstances indicate that it would result in basically unfair procedure."  *Norman*, 429 F.3d at 1091 n.5 (internal quotations omitted) (quoting *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 800 (Fed. Cir. 1990)).  Here, although Ironclad did not address injunctive relief in its moving brief, plaintiff's response did include arguments related to that matter.  The court agrees with plaintiff that, because defendants were able to fully respond to Ironclad's contentions regarding permanent injunctive relief in their reply briefs, the concept of waiver announced in *Novosteel* is inapplicable.  *See* 284 F.3d at 1274.  The court

will consider Ironclad's arguments regarding the propriety of permanent injunctive relief, if and when such consideration is required.

## B.    Standing

Defendants argue that Ironclad lacks standing to protest the unrestricted awards made pursuant to the solicitation.[7]  There is no question that "[s]tanding is a 'threshold requirement in every federal action.'"  *Hamilton Sundstrand Power Sys. v. United States*, 75 Fed. Cl. 512, 515 (2007) (quoting *Sicom Sys. Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 975-76 (Fed. Cir. 2005)).  Indeed, for this court to have jurisdiction over a plaintiff's claims, the plaintiff must have standing to pursue them.  *See Myers Investigative and Security Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102-04 (1998)).  Accordingly, issues of harm and prejudice, which are essential to a plaintiff's standing, must be examined at the outset of any bid protest litigation.  *See Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (holding that an inquiry into the prejudice suffered by a protestor, as a result of an error in the procurement process, must be examined prior to a review of the merits of its protest).  As the party which seeks to invoke the court's jurisdiction, Ironclad bears the burden to establish each of the elements of standing, by showing "that there was a substantial chance [plaintiff] would have received the contract award but for the alleged error in the procurement process."  *Id.* (internal quotations omitted) (quoting *Alfa Laval*, 175 F.3d at 1367).

As explained, the Tucker Act provides the Court of Federal Claims with "jurisdiction to render judgment on an action *by an interested party* objecting to a solicitation by a Federal agency."  28 U.S.C. § 1491(b)(1) (emphasis added).  The statute does not define the term "interested party."  *See id.*  However, the Federal Circuit has adopted the definition of that term which is used in another federal

---

[7]/  Initially, Ironclad hoped to also challenge the section 8(a) and HUBZone awards made pursuant to the solicitation.  Plaintiff contended that, because it had submitted a proposal which encompassed some of the other contracts offered under the solicitation, it had standing to challenge the procurement as a whole, and all of the contracts awarded thereunder.  After defendants raised the issue of standing in relation to the section 8(a) and HUBZone awards, however, plaintiff conceded that it does not have standing to challenge those specific contract awards, given that it was not an "actual or prospective bidder" in relation to the section 8(a) and HUBZone awards.  *See* Oral Arg. Tr. at 7.

procurement statute, the Competition in Contracting Act, and applied it to the bid protest context, so that standing to protest a contract award in the Court of Federal Claims is "'limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract.'"  *Banknote*, 365 F.3d at 1351-52 (quoting *Am. Fed'n of Gov't Employees, AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001)).  To satisfy this standard, a plaintiff must establish that it was an actual or prospective bidder or offeror on the procurement being challenged, and that the plaintiff "had a substantial chance of being awarded the contract but for the alleged violation of the procurement statute or regulation."  *Hamilton Sundstrand*, 75 Fed. Cl. at 515.  Thus, in conducting an inquiry into standing, which must occur "at the threshold of the merits inquiry," the court must "consider [the protestor's] plausible allegations and merely ask whether, if they turn out to be correct, [the protestor] had more than an insubstantial chance of receiving the award."  *Id.*  In doing so, the court is "required to make factual findings . . . from the record evidence as if it were conducting a trial on the record."  *Bannum*, 404 F.3d at 1357.

Here, there is no question that plaintiff submitted a proposal in an attempt to secure the unrestricted awards offered under the solicitation.  Ironclad has therefore satisfied the first part of the two-part test for standing in relation to those awards.  *See Banknote*, 365 F.3d at 1352.  The parties disagree, however, on whether plaintiff can carry its burden of proof regarding the second requirement, which centers on the question of prejudice.

In its briefing, Ironclad concedes that it was not one of the offerors chosen to comprise the competitive range for the unrestricted awards.  Pl.'s Resp. at 22.  That fact, which is also established by the administrative record, is a serious impediment to plaintiff's claim of standing.  *See Galen Med. Assocs., Inc. v. United States*, 56 Fed. Cl. 104, 108 (2003) (stating that the standard for an "interested party" in bid protest cases "weeds out protestors that  . . . finish lower than second after evaluation") (citing *Impresa*, 238 F.3d at 1334).  To show that it nevertheless may challenge the unrestricted awards, Ironclad claims that the Corps erred when it failed to provide plaintiff with a copy of Amendment 12 to the solicitation, and that, but for this error, Ironclad would have had a substantial chance to win an unrestricted award.  Ironclad contends that even though it had been eliminated from the competitive range at the time Amendment 12 was issued, it was nevertheless entitled to a copy of that document because Amendment 12 materially changed the terms of the solicitation, and was directly related to the reason for

14

Ironclad's exclusion from the competitive range. Pl.'s Resp. at 22 (citing *Candle Corp. v. United States*, 40 Fed. Cl. 658 (1998); *Am. Med. Depot*, B-285060, 2002 CPD ¶ 7 (Comp. Gen. July 12, 2000); *Info. Ventures, Inc.*, B-232094, 88-2 CPD ¶ 443 (Comp. Gen. Nov. 4, 1988); *Amperif Corp.*, B-211992, 84-1 CPD ¶ 409 (Comp. Gen. Apr. 11, 1984)). Plaintiff claims that, had it received Amendment 12 and learned that offerors could be awarded more than one contract, Ironclad would have lowered its proposal prices based on the possibility of an increased volume of work; would have been one of the five to seven lowest priced offerors for the unrestricted contracts; and would have been among the offerors chosen to comprise the competitive range. Then, plaintiff claims, its exemplary proposal ratings would have assured it an unrestricted award. In support of these contentions, Ironclad relies on an affidavit from one its principals, Matthew Curnutte. According to plaintiff, Mr. Curnutte's affidavit states that

> if defendant had properly issued Amendment 12 to Ironclad/EEI as it did to other offerors, it would have had a substantial chance of being awarded an unrestricted contract (i.e. being among the lowest 5-7 offerors) considering the exemplary ratings it received for the SDVOB evaluation. A review of the administrative record evidences that plaintiff's ratings for the most important three factors were significantly higher than the three firms who were awarded the contracts. Since plaintiff's proposed price would have been measurably lower if it had received Amendment 12, there is a substantial chance it would have been included in the competitive range and awarded one of the unrestricted contracts. In other words, but for defendant's violation of the law and RFP, plaintiff had a substantial chance of receiving one of the unrestricted awards. As such, plaintiff has standing to protest the unrestricted awards herein.

*Id.* at 11-12 (internal citations omitted).

Defendants respond by arguing first that plaintiff has identified no error in the procurement process which is relevant to Ironclad's ability to secure an unrestricted award. The United States claims that plaintiff was not entitled to a

copy of Amendment 12, because Ironclad had been eliminated from the competition before the amendment was issued.  Defendants point out that under 48 C.F.R. § 15.206(c) (2006), amendments issued after the deadline for receipt of proposals must only be sent to those offerors which have not been eliminated from competition.  The United States claims that even if an exception to that rule as described by plaintiff does exist, there is no evidence that Amendment 12 related directly to the reason why Ironclad had been eliminated from the competitive range.  In the government's view, Amendment 12 related not to price, but instead, to the question of which of the parties would be eligible for each award.  Defendants further insist that, because Ironclad was not among the offerors chosen to comprise the competitive range for the unrestricted awards, and has identified no error in the procurement process relevant to its elimination, plaintiff cannot show that it was within the "zone of active consideration" for the unrestricted awards, such that it had a substantial chance of winning one of them.  Def.'s Mot. at 10; Campbell and MGC/Campbell's Mot. at 8.

In the alternative, defendants claim that even if Ironclad had been entitled to receive Amendment 12, the Corps' failure to provide that document to Ironclad did not deprive plaintiff of a "substantial chance" to win an unrestricted award.  According to intervenors, Ironclad has presented no persuasive evidence to show that, had plaintiff received the amendment, the joint venture would have changed its proposal in such a way that plaintiff would have been selected for inclusion in the competitive range.  *See* Campbell and MGC/Campbell's Mot. at 7.  In support of this position, defendants point out first that Amendment 12 was issued after the closing date for submission of proposals.  Thus, none of the companies which presented offers in response to the unrestricted portion of the procurement received Amendment 12 before submitting their proposals.  Further, the Corps did not permit any of the offerors to revise their proposals in response to the amendment.  Based on these facts, defendants insist that Ironclad's claim that it would have altered its offering price in response to Amendment 12 is baseless.  Finally, the government argues that, if the court were to accept the assertion that Ironclad would have amended its pricing information in response to Amendment 12, the court would also have to assume that other bidders would have made similar adjustments.  Def.'s Mot. at 19.  The United States argues that, had such proposal revisions been permitted by the Corps, all of the offerors would have lowered their prices for the unrestricted work, and plaintiff still would not have been selected for the competitive range.

16

Before examining the parties' contentions, it warrants repeating that Ironclad, as the party which seeks to invoke this court's bid protest jurisdiction, bears the burden of proof on the question of whether plaintiff had a direct economic interest in the unrestricted awards. *See Myers*, 275 F.3d at 1369 ("The party invoking federal jurisdiction bears the burden of establishing [the] elements [of standing]." (internal quotations omitted) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992))). To carry its burden, Ironclad "must demonstrate more than 'a mere possibility that [it] would have received the contract but for the error in the procurement process.'" *Asia Pacific*, 68 Fed. Cl. at 18 (quoting *Data General*, 78 F.3d at 1562). On the other hand, plaintiff "is not required to show that but for the alleged error, [Ironclad] would have been awarded the contract." *Data General*, 78 F.3d at 1562; *Asia Pacific*, 68 Fed. Cl. at 18; *see also North Carolina Div. of Servs. for the Blind v. United States*, 53 Fed. Cl. 147, 161 (2002). Instead, Ironclad's burden falls somewhere in the middle, requiring it to demonstrate that "had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract." *Data General*, 78 F.3d at 1562. The plaintiff's chance of winning the award, in other words, "must not have been insubstantial." *Information Technology & Applications*, 316 F.3d at 1319. This "standard reflects a reasonable balance between the importance of (1) averting unwarranted interruptions of and interferences with the procurement process and (2) ensuring that protesters who have been adversely affected by allegedly significant error in the procurement process have a forum available to vent their grievances." *Data General*, 78 F.3d at 1563; *Asia Pacific*, 68 Fed. Cl. at 18.

Here, a careful examination of the facts which led to this protest undermines Ironclad's assertions regarding the relevance of Amendment 12. First, Ironclad's claim of entitlement to Amendment 12 is poorly founded. True, the Government Accountability Office (GAO) has held that offerors eliminated from the competitive range are entitled to receive amendments issued after their elimination from competition, when those amendments relate directly to the reason for their elimination. *See Information Ventures*, B-232094, 88-2 CPD ¶ 443 (explaining that "if the agency knows that a potential offeror was excluded from the competitive range for a reason that no longer exists after a subsequent amendment relaxing the solicitation's terms, the offeror should be notified of the changes, especially of any relaxed requirements, since the firm, after the amendment, is

17

potentially fully capable of fulfilling the agency's needs").[8]  Here, however, there was no direct relationship between Amendment 12, which deleted the solicitation provision which limited each offeror to one contract award only, and plaintiff's elimination from the competitive range, which was based on Ironclad's high prices. The absence of such a connection is demonstrated by the fact that the offerors which received Amendment 12 were not permitted to change their prices in response to the amendment.

Further, and more importantly, even when all of the facts alleged by plaintiff are assumed to be true, plaintiff has presented no persuasive argument regarding how plaintiff was prejudiced by its failure to receive Amendment 12.  First, it is clear that the amendment was issued *after* all proposals for the unrestricted portion of the procurement had been submitted to the Corps.  *See* AR at 444.  In addition, the record is uncontroverted that the agency did not permit offerors to amend their proposals in response to it.  It follows that, even if Ironclad had received a copy of Amendment 12, plaintiff would not have been able to change the pricing information included in its proposal.  Ironclad's allegation that it would have lowered its offering prices in response to Amendment 12 is therefore unsupportable.

The court also agrees with the government that all of Ironclad's allegations regarding the probable outcome of the solicitation, had plaintiff received Amendment 12 and been permitted to amend its proposal, are at best speculative. As defendant correctly points out, Amendment 12 provided only for the *possibility* that an offeror could be awarded more than one contract.  In addition, the contracts granted under this procurement were designated as IDIQ awards, meaning that an undetermined quantity of work would be ordered by the Corps pursuant to each contract.  For these reasons, it is clear that Amendment 12 did not necessarily guarantee a higher volume of work to any one awardee.  Accordingly, no definitive determination regarding Amendment 12's effect on performance cost or pricing can be made here, whether by the parties or by the court.  *Cf. Candle Corporation*, 40 Fed. Cl. at 665 ("Here, Candle's price was significantly higher than Boole's and the total price for *PQEdit*, the component providing the capability to edit message contents, was only a small fraction of the total.  Thus, if the government had

---

[8]/ Notably, GAO decisions are not binding of the Court of Federal Claims, but are merely advisory.  *North Carolina*, 53 Fed. Cl at 165 n.13 (citing *Bean Dredging Corp. v. United States*, 22 Cl. Ct. 519, 522 (1991)).

complied with its legal obligations and notified Candle that this capability was no longer a minimum essential requirement, the record indicates Candle's price still would have been considerably more expensive than Boole's." (internal citation omitted)).

In addition, the affidavit from Mr. Curnutte, which is at the heart of Ironclad's claim of prejudice, is conclusory and unpersuasive. With regard to price changes, Mr. Curnutte avers only that the joint venture would have lowered its prices and that "[t]his resultant price decrease would be approximately 13.77% for installation of government furnished [materials], and approximately 6.88% lower for furnishing and installing structural panels, joists and rafters." Curnutte Aff. ¶ 7. Notably, the affidavit does not explain the manner in which these percentage decreases were calculated. Ironclad likewise has not presented additional evidence to support the allegations contained in that affidavit. *Cf. MVM, Inc. v. United States*, 46 Fed. Cl. 137, 140-41 (2000) (court conducted "paper trial" to examine expert witness reports regarding the manner in which an agency's change to solicitation requirements would have affected offerors' prices had an amendment been issued). In the court's view, plaintiff relies on no more than a post-hoc assertion of what it "might have done" regarding pricing, had the circumstances been different. Similar arguments presented in this court have had little success. In *Candle Corporation*, for example, the court determined that a verifiable change in pricing due to an agency's *de facto* change to solicitation requirements would not have altered the outcome of the solicitation, and then went on to reject the plaintiff's generalized argument that "it may not have 'employed the same proposal pricing strategy,'" had it known of the change. 40 Fed. Cl. at 665. The court indicated, in that case, that the plaintiff's claim was particularly unpersuasive because it was not supported by affidavits or other evidence. *Id.* Here, of course, plaintiff has supplied an affidavit in support of its argument, but the court finds that the affidavit, which includes only conclusory and self-serving allegations, does little to satisfy Ironclad's burden of proof.

The court must also agree with the United States that, were it to engage in speculation regarding the manner in which Ironclad might have amended its offer in response to Amendment 12, it would also have to assume that other offerors would have changed their proposals as well. Plaintiff offers no substantive response to the government's argument that, had that happened, Ironclad still would not have presented a price proposal attractive enough to qualify for the competitive range. Moreover, it would be impossible for the court to divine the

success or failure of an amended proposal from Ironclad, given that "a second [best and final offer] may reasonably be rated higher *or lower* than an offeror's initial proposal or its prior [best and final offer]." *Labat-Anderson, Inc. v. United States*, 42 Fed. Cl. 806, 848 (1999) (emphasis in original).

In sum, the agreed upon facts of this case demonstrate that plaintiff was eliminated from the competitive range with regard to the unrestricted portion of this solicitation because the prices set forth in its proposal were not competitive.  In that regard, plaintiff had no right to receive further solicitation amendments.  Additionally, Ironclad's assertion that it would have changed that pricing information, had it been privy to Amendment 12, is speculative and unpersuasive, at best.  Ironclad is simply "[a] disappointed offeror that has made a business judgment to propose an expensive product," and under the law of this circuit, plaintiff "cannot utilize the protest system to obtain the proverbial second bite at the apple." *Candle Corporation*, 40 Fed. Cl. at 665-66 (quoting *Alfa Laval Separation, Inc. v. United States*, 40 Fed. Cl. 215, 235 (1998), *rev'd on other grounds*, 175 F.3d 1365 (Fed. Cir. 1999)); *see also Data General*, 78 F.3d at 1564.  Finally, the government has shown that because no offerors were permitted to alter their prices after the issuance of Amendment 12, the amendment would have had no impact upon Ironclad's price.

For the foregoing reasons, the court concludes that the Corps was not required to provide Ironclad with Amendment 12 and, even if the Corps erred when it did not provide Amendment 12 to Ironclad, plaintiff has not carried its burden to establish that it was prejudiced by that error.  Any claimed error was therefore harmless.  *See Galen Medical Associates*, 369 F.3d at 1330.  Plaintiff's contentions regarding Amendment 12 do not vest Ironclad with standing to challenge the unrestricted awards.  Defendants' motions to dismiss plaintiff's challenge to those awards, and any claim of error related to Amendment 12, are granted.

### C.    Plaintiff's Final Contention:  Termination of the SDVOB Contract, Institutional Waiver and the Duty of Fairness

Ironclad also claims that the Corps' decision to terminate its April 2006 SDVOB contract was improper.  Plaintiff argues, specifically, that the contracting officer (CO) abused his discretion when he decided to apply the SBA's findings regarding Ironclad's size status to that SDVOB award, rather than treating these

findings as prospective only.  To show that immediate application of the SBA decision was unfair, plaintiff claims that the CO simultaneously permitted section 8(a) awards to other companies to go forward, despite the fact that he should have been aware that those companies also did not qualify for the work under the relevant size standards.[9]  Ironclad follows that claim with an overarching contention that the Corps interpreted and applied the size standard assigned to this procurement inequitably.[10]  Plaintiff complains that the CO required Ironclad to meet that standard (and terminated its SDVOB contract when it failed to do so) while simultaneously waiving it for the companies which had been awarded section 8(a) contracts.  Ironclad argues that, by committing such a one-sided "institutional waiver" of solicitation requirements, the agency violated its duty to treat all offerors fairly and equally.  Pl.'s Mot. at 17 (citing *Hunt Building Co., Ltd. v. United States*, 61 Fed. Cl. 243, 274 (2004); *TLT Constr. Corp. v. United States*, 50 Fed. Cl. 212, 216 (2001)).  Based on these allegations, Ironclad urges the court to find that the CO's conduct was arbitrary and capricious, and to order the Corps to reinstate the SDVOB contract or to conduct a reprocurement of the SDVOB contract.

---

[9]/  Plaintiff additionally claims that the manner in which the Corps terminated the SDVOB contract violated FAR 49.101(b) and 49.603-6.  Ironclad claims, specifically, that the Corps erred when it failed to provide plaintiff with a notice of termination in advance of issuing the termination modification which ended the parties' contractual relationship.  This contention is without merit.  As defendants have correctly pointed out, the regulations provide for issuance of a no-cost settlement agreement *in lieu of* a termination notice.  *See* 48 C.F.R. § 49.101(b) (2006) (stating that "[t]he contracting officer shall effect a no-cost settlement instead of issuing a termination notice" under certain circumstances).  In any event, this allegation, correct or not, provides no basis for relief, as it constitutes no more than a *de minimus* error in the procurement process.  *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996); *Andersen Consulting v. United States*, 959 F.2d 929, 935 (Fed. Cir. 1992) (stating that errors which are "so insignificant when considered against the solicitation as a whole that they can safely be ignored and the main purposes of the contemplated contract will not be affected" are *de minimus* and therefore not a basis for overturning an award); *see also DynCorp Int'l, LLC v. United States*, 76 Fed. Cl. 528, 536 (2007).

[10]/  Any claims which are directly related to the NAICS code assigned to this procurement are relevant to the small business awards only.  Because Ironclad concedes that it does not have standing to challenge the small business awards made under the solicitation, these arguments are moot.  *See* Oral Arg. Tr. at 7.

Defendants request judgment on the administrative record on this multi-faceted claim.  They contend, first, that the CO's termination of Ironclad's SDVOB contract was not an exercise of discretion by the CO, but was, instead, a requirement since the SBA found Ironclad to be ineligible for award.  Defendants further insist that the CO did not give preferential treatment to the section 8(a) awardees by ignoring questions related to their size, but instead, properly relied on the SBA size certification letters submitted by those companies along with their proposals.  And more generally, defendants assert again that, even if Ironclad's allegations of error are correct, plaintiff cannot demonstrate prejudice.  Defendants claim that, given Ironclad's admission that it is not eligible for the SDVOB award, plaintiff cannot legally perform the SDVOB contract and therefore has nothing to gain from a reinstatement of that contract or an order to resolicit proposals for the SDVOB award.

As defendants correctly point out, 13 C.F.R. § 121.1009 governs the effect of SBA size determinations on federal procurements.  That regulation provides, in relevant part, as follows:

> (g) Results of an SBA Size Determination.
> (1) A formal size determination becomes effective immediately and remains in full force and effect unless and until reversed by OHA.
> (2) A contracting officer may award a contract based on SBA's formal size determination.
> (3) If the formal size determination is appealed to OHA, the OHA decision on appeal will apply to the pending procurement or sale if the decision is received before award.  OHA decisions received after contract award will not apply to that procurement or sale, but will have future effect, unless the contracting officer agrees to apply the OHA decision to the procurement or sale.

13 C.F.R. § 121.1009(g) (2007).  As the text of this regulation makes clear, initial SBA size determinations take effect immediately.  *Id.* § 121.1009(g)(1).  Decisions by OHA, on the other hand, are subject to discretionary application by the CO in cases in which they are received after award.  *See id.* § 121.1009(g)(3).  It follows that, here, the SBA's decision that plaintiff was "other than small" became effective immediately after issuance, and was binding on the subject procurement,

as a matter of law.  13 C.F.R. § 121.1009(g)(1).  The Corps therefore terminated Ironclad's SDVOB award immediately following the SBA decision.  The CO did not, in other words, exercise discretion regarding the manner in which that decision was applied.

Further, even if the CO had not been required to apply the SBA's decision to Ironclad's SDVOB award, the facts of this case would not justify a finding that his decision to do so was an abuse of discretion.  It is critical to recognize that plaintiff *admitted* to the CO and to the SBA, shortly after ESA South's protest was filed, that Ironclad was not eligible for the SDVOB award.  *See* AR at 419.  Thus, even if the CO's decision to terminate Ironclad's contract had not been mandated by the small business regulations, it was nevertheless appropriate, based on plaintiff's own conduct.  Given the requirements of the small business size regulations and plaintiff's own admission regarding its SDVOB eligibility, there is no basis on which to conclude that the CO abused his discretion in this instance.

The court must also reject Ironclad's overarching contentions regarding an alleged "institutional waiver" of the solicitation's size requirements.  Plaintiff is absolutely correct that it is a "'fundamental principle of government procurement . . . that contracting officers treat all offerors equally and consistently apply the evaluation factors listed in the [s]olicitation.'"  *Hunt Building*, 61 Fed. Cl. at 274 (quoting *TLT Construction,* 50 Fed. Cl. at 216).  Here, however, the facts established by the record do not support a claim that the CO violated that principle.  Instead, the record demonstrates that the circumstances surrounding Ironclad's contract eligibility were materially different from the circumstances regarding the other offerors' qualifications, and thus led to different outcomes.  Again, the record is uncontroverted that, after ESA South protested Ironclad's size, plaintiff conceded that it was ineligibile for the SDVOB award.  Shortly thereafter, the SBA issued a decision that plaintiff was "other than small."  *See* AR at 419.  Under the SBA regulations, the CO was required to apply that decision to the procurement and terminate the award to plaintiff.  13 C.F.R. § 121.1009(g)(1).  The section 8(a) awardees, on the other hand, never made admissions that they were large businesses and therefore ineligible for section 8(a) awards.  No decision declaring any of those companies to be "other than small" was ever issued by the SBA.  Accordingly, the Corps had no basis on which to revoke those companies' contracts.

The court is not unsympathetic to Ironclad's position that, in light of the evidence it alleges that it presented to the CO regarding the size status of the section 8(a) awardees, the agency should have asked the SBA to investigate those companies' contract eligibility. However, there is no question that, because plaintiff was not an offeror in relation to the section 8(a) contracts, it did not have standing to pursue a size protest in relation to those awards. 13 C.F.R. § 121.1001(a)(2) (2007); *see also* 13 C.F.R. § 124.517(b) (2007). In addition, it was the exclusive province of the SBA, and not the CO, to determine whether each of the section 8(a) offerors was qualified for award. *See* 13 C.F.R. § 124.507(b) (2007). The court agrees with defendants that, in this instance, the CO was entitled to rely on the conclusions reached by the SBA through its use of the well-established regulatory process for determining size eligibility in section 8(a) procurements.

Furthermore, it is critical to recognize that the issue presented in this protest is whether plaintiff can show that the CO's conduct was arbitrary and capricious, an abuse of discretion, or otherwise contrary to law. *See* 5 U.S.C. § 706(2)(A). Here, plaintiff's claim of unequal treatment is based largely on the May 30, 2006 letter in which Ironclad outlined the alleged illegal affiliations between various section 8(a) awardees. The government has now presented evidence which indicates that the CO never received that letter. *See* Hickman Decl. Plaintiff has not controverted that assertion, and, unfortunately, there is no way to definitively determine whether the letter was or was not received by the Corps. Ironclad's reliance on the letter thus does little to satisfy its burden of proof. Plaintiff also hopes to rely on an affidavit from another Ironclad principal, Mr. Dan Eastman. The admissibility of that document is disputed by the parties. In the court's view, however, the probative value of that affidavit is slight when it is compared with the balance of the record evidence. Thus, even if the document were to be deemed admissible, it would be of little value to Ironclad. Based on the facts presented here, plaintiff simply has not carried its burden to demonstrate that the CO's conduct violated the relevant standards.

Finally, there is no basis upon which to conclude that any of the errors alleged by Ironclad in this lawsuit were actually prejudicial to plaintiff. Ironclad admits that it has no standing to challenge the section 8(a) or HUBZone awards. In addition, plaintiff lacks standing to challenge the unrestricted awards because it cannot show that, but for the government's errors, it would have had a substantial chance to win one of those contracts. Similarly, if the court were to order the

Corps to cancel the existing contracts, and the agency were to resolicit the SDVOB portion of the procurement, Ironclad would not be able to submit a proposal in relation to that work, as it has conceded its ineligibility for an SDVOB award.  It is clear, therefore, that to the extent the errors alleged by Ironclad occurred, they were harmless.  Although the court has engaged in a protracted discussion and analysis of plaintiff's claims, the inexorable conclusion in this case is that Ironclad has no real interest in, and thus no standing to pursue, any of the claims which it has asserted.  For all of these reasons, the final count of plaintiff's complaint must also be dismissed.

Based on all of the above, it is clear that a grant of permanent injunctive relief would not be appropriate in this instance.  The record is uncontroverted that Ironclad waited almost one year to file its claims, and plaintiff has presented no explanation for that delay.  *See PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) (setting forth factors to be considered by the court in determining whether to grant injunctive relief, including "whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief").  Ironclad has also failed to achieve actual success on the merits of this suit.  *Id.*  Furthermore, the crux of Ironclad's argument is that, because the Corps allegedly awarded section 8(a) contracts in a manner that ran afoul of various procurement regulations, the agency should likewise be required to grant an SDVOB award to plaintiff despite its status as a large business.  A judicial decision granting such relief would be wholly unsupportable, however, as it would effectively serve as a judicial sanction of agency actions which deliberately violate federal procurement law.  Such an order would undoubtedly compromise the well-established "overriding public interest in preserving the integrity of the federal procurement process by requiring government officials to follow procurement statutes and regulations," and, as such, would be intolerable.  *CW Gov't Travel, Inc. v. United States*, 61 Fed. Cl. 559, 578 (2004).

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** as follows:

(1)     Plaintiff's Motion for Judgment Upon Administrative Record, including its request for injunctive relief, filed June 21, 2007, is **DENIED**.  The Motions to Dismiss filed by defendant and intervenor-defendants on July 23 and 24, 2007, are **GRANTED**.  The Cross-

Motions for Judgment on the Administrative Record filed by defendant and intervenor-defendants are **DENIED** as moot;

(2)   The Clerk's Office is directed to **ENTER** final judgment **DISMISSING** the complaint in its entirety without prejudice in this action;

(3)   On or before **October 1, 2007**, counsel for the parties shall **CONFER** and **FILE** with the Clerk's Office a **redacted copy** of this opinion, with any material deemed proprietary marked out and enclosed in brackets, so that a copy of the opinion can then be prepared and made available in the public record on this matter; and

(4)   Each party shall bear its own costs.

/s/ Lynn J. Bush
LYNN J. BUSH
Judge